800 So.2d 49 (2001)
John BRANDON and Chris Brandon
v.
Mickey C. TROSCLAIR, Chevron Chemical Company, Je Merit Constructors, Inc., and A & B Insurance Companies.
No. 2000-CA-2374.
Court of Appeal of Louisiana, Fourth Circuit.
October 17, 2001.
*50 Walter J. Leger, Jr., Michael J. Mestayer, Leger & Mestayer, New Orleans, LA, Counsel for Plaintiffs/Appellants.
*51 Boris F. Navratil, Navratil, Hardy & Bourgeois, L.L.P., Baton Rouge, LA, Counsel for Defendant/Appellee.
Court composed of Judge MIRIAM G. WALTZER, Judge PATRICIA RIVET MURRAY and Judge MAX N. TOBIAS, JR.
Judge MIRIAM G. WALTZER.

STATEMENT OF THE CASE
John Brandon and his wife, Chris, filed suit on 27 May 1994 against Mickey C. Trosclair and his alleged employers, Chevron Chemical Company and J.E. Merit Constructors, Inc. and their insurers for damages arising out of a collision that occurred when Brandon's vehicle struck the rear of the Chevron truck Trosclair was driving. Defendants answered. The case was consolidated with Insurance Company of North America, ESIS Incorporated and J.E. Merit Constructors, Inc v. John R. Brandon, Barrilleaux Truck Service, Inc., Ace Transportation, Inc. and Lloyds of London, involving the same injured party, accident and defendants.
On 25 July 1997, the trial court granted defendants' motion for partial summary judgment dismissing with prejudice Brandon's claim for punitive damages. Following trial on the merits, on 18 November 1999 the trial court determined that the law and evidence favor the conclusions that the accident was caused solely by Brandon's negligence and fault, and that defendants-appellees did not cause or contribute to the injuries sustained by Brandon or damages to his wife, and rendered judgment in favor of defendants, dismissing plaintiffs' suit with prejudice at plaintiffs' cost. From that judgment, the Brandons appeal. We affirm.

STATEMENT OF FACTS
The parties entered into the following stipulations prior to trial:
1. J. E. Merit Constructors, Inc., was hired by Chevron U.S.A., Inc. to perform various work functions in conjunction with Chevron's Belle Chasse refinery.
2. In conjunction with the work in question, Chevron supplied to Merit various pieces of equipment, including the flat bed trailer and tractor unit involved in the accident in question.
3. The contract between Merit and Chevron classifies the Merit employees as special employees of Chevron and these employees were required to sign an agreement that in the event of personal injury or death their sole remedy against Chevron was in workers' compensation.
4. On 3 June 1993, Trosclair, an employee of Merit under contract to Chevron, was operating a Chevron-owned 1978 Freightliner tractor and 1974 Lufkin trailer on Louisiana Highway 23 in Plaquemines Parish.
5. Loaded on the Chevron trailer were fifty-eight 42-gallon drums containing lube oil additive.
6. The Trosclair rig entered the highway from a location on the west side of Highway 23 and proceeded north toward the Chevron plant in Belle Chasse, Louisiana, located less than one mile away.
7. On the same day, Brandon, operating a 1988 Peterbilt tractor unit pulling a 1987 Lufkin trailer, was proceeding northbound on Louisiana Highway 23 in Plaquemines Parish.
8. As a result of the collision, all of the drums loaded on the Chevron trailer became dislodged from the trailer.
The trial judge entered detailed reasons for judgment, including specific findings of fact. He found that the rear end collision occurred on a clear day at about 1:30 p.m. on the four lane Belle Chasse highway *52 (Louisiana Highway 23), in front of the Chevron Chemical Company plant and one hundred feet south of Gate 3 to the plant. The highway at this location is a four-lane highway embracing two roadways divided by a twenty-four foot wide compacted neutral ground. The north bound roadway where the accident occurred consists of two asphalt topped concrete lanes each twelve feet in width with a ten foot hard surface shoulder on the right (east) side and an eight foot hard surface shoulder on the neutral ground (west) side. From the right hand surfaced shoulder there is an additional compacted grass covered shoulder extending about sixty feet to railroad tracks running parallel to the highway. Just off the hard surface right shoulder and on the grass covered right of way at about 300 feet from the plant entrance are two continuously flashing yellow caution lights warning of the plant entrance ahead and of congesting, crossing or emerging traffic moving into and out of the entrance.
The trial court found that both tractortrailer trucks were traveling north toward the plant at the time of the accident. Brandon was operating a tractor trailer loaded with seven tons of steel beams, sheets of metal grating, a welding machine and two air tuggers, which were strapped down and secured to the trailer bed. Brandon had driven 120 miles from his home in LaRose to Venice, where he picked up his cargo, and then an additional sixty miles from Venice to the Chevron plant.
Trosclair testified that he drove his rig only between the barrel warehouse and the Chevron plant's barrel annex, a distance of only one-half mile on Louisiana Highway 23. He testified that he never transported the drums to any other location, but only back and forth on this half-mile stretch of highway. He testified that in the approximately two thousand trips he made between the warehouse and the Chevron plant, carrying the drums in the same manner as on the day of the accident, he never had a drum fall off or slide, no matter whether the load was only one drum or a full load of 84 drums. The issue of sliding barrels never came up at safety meetings.
Trosclair's trailer was loaded with fifty-eight barrels of lube oil additive owned by Chevron and loaded four abreast from the front of the trailer continuing for fourteen rows or a distance of twenty-eight feet toward the rear of the trailer. The trailer measured eight feet wide and forty feet long and had a capacity of eighty barrels standing upright, four abreast and twenty deep. The trailer was equipped with fixed two inch pipe railings around the sides and back of the trailer about nine to ten inches high. At the front of the trailer, the railing was over three feet high. The side and rear railings were exactly one-third the height of a barrel of lube oil additive. The drums were not otherwise secured to the bed of the trailer. Each drum or barrel is thirty inches high and two feet in diameter. Trosclair testified that he had never been instructed to load the barrels in any other way, or to use straps or to tie down or otherwise secure the drums in any other manner than to place them together within the railing. We note that Brandon testified that his own load was tied down, but admitted that his flatbed, unlike Trosclair's, was not equipped with side bar rails, a rear gate or a "headache bar" in front. Brandon also admitted that his load came loose apparently from the force of the collision.
The trial court noted Trosclair's testimony that he regularly tested the vehicle's brakes and lights, that he tested all his lights, hazard flashers and four brake lights before the trip that culminated in the accident and that the vehicle is inspected *53 at least three times each month. Les Holland, Chevron's Manager of Human Resources, testified that he maintains the company's records, and those records showed that the Trosclair rig had been inspected by the Department of Transportation on 13 May 1993, just three weeks before the accident in question. He also identified bills evidencing maintenance performed on the trailer on 3 April 1993 and on 29 April 1993, and replacement of a mirror and bracket on 18 May 1993 in response to the Department of Transportation inspection. Holland testified that he had no knowledge or record of any drum having fallen from Chevron's trucks prior to the accident, from either Trosclair's rig or the other similar rig used by Chevron.
Trosclair was driving from a warehouse to the Chevron plant at about 45 miles per hour, intending to enter through a main entrance, Gate 3. When he reached the area of the Parish sewerage plant immediately south of the Chevron plant, he looked in his rear view mirror and put his right blinker lights on and started slowing down. He recalled having been passed by fellow employee Stanley Johnson and by an eighteen wheeler at the time he put on his turn signal. He passed the yellow traffic signal lights as he continued to slow down. He was traveling at about ten to fifteen miles per hour close to the southern corner of the entrance to Gate 3 when he was hit in the rear by Brandon's eighteen wheeler. Trosclair was rendered unconscious and received injuries that disabled him for about two and one-half years after the accident.
Brandon admitted that he has no recollection of the time directly leading up to the accident, and did not recall having seen the accident itself, although he did recall noise, hitting and pounding, sounding like things being torn apart, breaking and tearing. He testified that the last thing he remembered was traveling at 55 miles per hour up the Belle Chasse Highway, looking at houses in a recently developed residential subdivision.
The trial judge found that as a result of the collision, the Trosclair truck and trailer were propelled forward in a north easterly direction over 200 feet from the point of impact across the shoulder, the elevated railroad tracks, a two foot concrete wall, through fencing and into the grounds of the Chevron plant. The cargo of barrels fell when the trailer on which they were placed was abruptly propelled from under them by the impact. The barrels then dropped toward the highway after the initial impact and at a distance up the highway from the point of impact. The trier of fact accepted the opinion of defendant's expert that this occurred no less than sixty feet north of the point of impact. The videotape made by Chevron's security camera located at Gate 3 confirms that opinion.
The trial judge found that all of the damage and resulting injuries occurred at the time of the impact of Brandon's truck with the rear of the Trosclair vehicle and before any barrels came off. The bumper of Brandon's truck hit the axle and rear eight wheel tandem assembly, knocking it completely loose from the trailer and sending it about 270 feet forward, northeasterly, up the highway's east shoulder. The Brandon truck drove its radiator and engine against the bed of the trailer totally destroying the radiator, peeling the hood back against the cabin and windshield and knocking the engine completely from its bedding causing it to drop to the highway. Brandon verified in his testimony that the engine had dropped down below the cab and identified a photograph of the engine sitting on the ground, resting on the flat-bed trailer. Donald Barrileaux, Brandon's employer, verified that the engine had fallen *54 to the ground and that the cab was twisted to the right. The truck cabin drove at an angle into Trosclair's trailer causing damage to the center and right side of the cabin and forcing Brandon's truck to spin or whip clockwise throwing Brandon, who admitted he was not wearing his seat belts, against the left and left top of the cabin. The bumper of Brandon's truck struck the rear wheel assembly of Trosclair's truck, bending back the bumper and separating the rear wheel assembly from the Chevron trailer. The rear wheel assembly was propelled up the highway for about 200 feet.
Brandon identified a post-accident photo of his truck and testified that the blue mark on one of the two exhaust stacks was about ten feet high, or, in Brandon's opinion based solely on his experience of several years as a truck driver, slightly over five feet higher than the level of Trosclair's trailer. He also testified that the steel drums Trosclair carried were painted blue. However, plaintiffs' expert, Robert Eichler, denied having seen any blue paint. Brandon also identified oil drippings down the right-hand side of his truck, near what he referred to as "the sleeper." On cross-examination, Brandon identified damage to the cab, including a torn "headache rack" on the cab that he admitted could not have been caused by the Trosclair cargo. Brandon also was shown the two air tuggers and welding machine that had come off his own trailer.
On cross-examination, Brandon admitted that the bottom of his cab's air intake would have struck Trosclair's trailer, which would have pushed the engine out of the way, whereupon the trailer rode up on the engine. He also testified that the initial impact caused his truck to knock the tandem wheels out from under Trosclair's trailer.
Defense expert Richard Bernicker testified concerning his reconstruction of the accident. He explained that his analysis commenced at the point where the vehicles came to rest, which was the only place one could be certain they are at zero speed. He testified that in this case there was excellent photographic evidence, plus an on-site inspection by his colleague, Larry Hamm, who took the measurements on which Bernicker relied. Bernicker also knew from photographs showing jackknifing how the vehicles were moving down the road. The point of impact between the front of Brandon's rig and the rear trailer of Trosclair's rig was also discernible. He measured the various distances and was able to calculate how far the vehicles traveled post collision to their final resting positions. Clearly, the Trosclair rig was pushed by Brandon's rig over a small brick wall and through a fence surrounding the Chevron plant. The Trosclair rig and cargo weighed 55,000 pounds, give or take ten percent. The tare weight was probably about 30,000 pounds. He calculated that the Trosclair rig was moving at a minimum of ten miles an hour when it hit the wall. As the truck was moving, sliding forward and sideways, it jackknifed and moved in a diagonal and angular fashion, swinging in a clockwise direction. At one point the wheels came out and dropped down and the cab began to swing clockwise as well. He computed the drag factor (the loss in speeds between the point of impact and the point of final rest) using a conservative figure based on technical books. Using a drag factor of 0.2 for the Trosclair rig, at a speed of ten miles per hour at impact (using the common estimate of both Eichler and Bernicker), the Trosclair rig's speed is just over thirty-nine miles per hour just after the collision and ten miles per hour when it hit the wall. As a result of the collision, the Trosclair rig was accelerated up to 39 miles per hour.
*55 Bernicker performed similar calculations in relation to the Brandon rig, having measured its post-impact distance at 216 feet, and arrived at a post-impact speed of about 40 miles per hour. Working from that basis, using the principles of conservation of momentum, he concluded that the Brandon rig was traveling between 59 and 64 miles per hour, or between four and nine miles per hour above the highway speed limit, at the time of impact. The differential between the speeds of the two rigs was 49 to 54 miles per hour, leading to what Bernicker referred to as a horrific collision.
The trial court accepted Bernicker's analysis of the causes of the various elements of damage to the rigs. The damage to the underside on the left rear side of Trosclair's trailer was caused during the initial impact when the passenger or right end of the Brandon cab hit the left corner of the Trosclair trailer. The vehicles were offset, the Brandon rig off to the left, moving into the passing lane. The video shows the Trosclair truck in the right lane, so Brandon must have been four or five feet over to the left to have caught the two corners that were hit. Bernicker identified a photograph of the tandem wheels of Trosclair's trailer and the distortion of the attachment frame, noting that the springs had been popped loose from the frame. He opined that this is evidence of an extremely high speed impact, and is in no way consistent with an impact that is less than would pop the air bag in a car, contradicting Eichler's testimony.
Bernicker then reviewed a photograph of damage to Brandon's cab's front bumper, and opined that it was caused by the rear wheel assembly on the left side of the Trosclair trailer. The front wheel was broken and it appeared that the axle was bent. The entire axle assembly on the front of Brandon's truck was rotated toward the passenger side of the truck by the initial impact. This is additional evidence of a tremendous force to the rear tending to rotate the cab clockwise. The remarkable deformation of the front axle that rotated approximately 45 degrees was caused by the tremendous force on the passenger side of Brandon's truck due to the wheel assembly on the left side rear. The whole cab, including the driver's area, was whipped around clockwise. After Brandon's tractor slowed with the impact, the trailer did not, because it was not hit. The trailer then caused tremendous impact damage at the rear of Brandon's cabin. That set up the jackknife of Brandon's trailer, all of which was caused by the offset impact between Brandon's tractor and Trosclair's trailer. Brandon's trailer's pushing forward on his tractor aggravated the counter-clockwise movement of the tractor.
According to Bernicker, once the rig was in a jackknifing position, a problem arose with the "fifth wheel" or attachment point, between the trailer and the tractor. That point has a "king pin." The trailer rides up over the back of the tractor, the king pin goes in, so there is an overlap, such that the length of the combined vehicles is less than the sum of the lengths of the tractor and trailer. The force of the collision swung Brandon further to the left of his cabin, and swung the cabin to the left as well. Bernicker concluded that because of the offset hit and the cabin rotation, there were no barrels directly in front of Mr. Brandon. The only involvement of the barrels occurred after the collision, when some barrels struck only the passenger side of the truck, causing no damage to Brandon.
Bernicker testified further that the ICC bumper hanging down below the back of Brandon's trailer could not have prevented the trailer from moving into the engine *56 compartment of Brandon's tractor. The bumper could not stop the trailer where there was a 45 to 50 mile per hour differential speed between Trosclair's and Brandon's rigs. In this case, the whole bumper was completely destroyed and bent in half. The floor of Brandon's flat bed went over the bumper into the engine compartment. This is consistent with that trailer hitting the engine, knocking it down to the ground level. In response to questioning by the trial judge, Bernicker testified that it was physically impossible for the barrels to have caused this engine damage. The barrels came off at a high level, and the first thing to be hit is the flat bed. The barrels would come off above the level of the flat bed above the engine as far as vertical height. In his opinion, accepted by the trier of fact, the barrels came off after the collision was over. The damage was all done prior to the first barrel's coming off. The engine damage was due to the collision with the axle.
During the collision, Brandon's truck decelerated and Trosclair's truck accelerated tremendously. This caused the flatbed to shoot forward and the barrels on the flat bed, going at a constant speed of ten miles per hour, went down with the truck. The barrels accelerate only to the extent of the coefficient of friction between the bottom of the steel barrel and the top of the flat bed, 1.4 Gs. Even accepting Eichler's acceleration of 6 Gs, the flat bed is still accelerating from beneath the barrels. Using the Eichler factor, the barrels accelerate rearward at 4.2 Gs. The rear 30 percent of the flatbed, approximately twelve feet, was not being used. Using Eichler's calculations, the first barrel would have to move back eleven feet before it leaves the truck. The trailer is moving out from underneath the barrel much faster than the barrel is moving. The first barrel came off after 400 milliseconds, just under a half-second. The collision, according to both Eichler and Bernicker, took 100 milliseconds, or one-tenth of a second. Physical evidence substantiated Bernicker's conclusion, since the barrels are not located at the point of collision, but approximately sixty feet beyond the point of impact and on the passenger side.
Bernicker also opined that the damage to the steering wheel and axle were caused by the initial collision. The barrels could not have reached the axle to do the damage evident from photographs of Brandon's rig. The massive frame of the tractor was twisted by the force of the major impact. The collision coincides with Bernicker's estimation of the speed differential of 45 to 50 miles per hour.
Bernicker examined the videotape of the aftermath of the collision and noted that the barrels were falling from the force of gravity into the space between the Trosclair and Brandon rigs, and were not in any way riding up over the Brandon vehicle.
The trial judge accepted the defense expert's testimony that all of the damage was done before the first barrel came off Trosclair's truck, that the first barrel was about eleven feet from the end of the trailer before the trailer was propelled forward by Brandon's truck, and that the barrel came off no less than 60 feet after the point of impact. His testimony is supported not only by the videotape evidence showing all the barrels at least 60 feet north from the point of impact and mostly on the east shoulder and east lane of the highway, but also by the condition of the cabin of Brandon's truck after the collision, by the engine's having been knocked from its bedding, and by the bending of the two frames of the Brandon truck.
The trial judge also accepted the defense expert's opinion that the collision *57 was as bad an impact as he has ever seen. This opinion was shared by State Trooper Raphael G. Meyer, the investigating officer, who testified that it was obvious from the type of impact and massive force involved that both vehicles' cargoes were thrown as a result of the Brandon vehicle's striking Trosclair's rig. Eyewitness Reverend E.E. Davis testified that Brandon's vehicle was going 70 or 75 miles per hour when it struck Trosclair. Further evidence of the force of the impact is the videotape showing the conditions of the vehicles after impact, their location and the fact that Trosclair's tandem assembly was propelled approximately 270 feet up the highway by the impact. Additionally, the separation of the engine from its bed, the curvature of the Brandon truck's frame, the twisting of the frame and steel bed of Trosclair's trailer, the complete destruction of the passenger side of Brandon's cabin, and the personal injuries to the drivers could not have been done by the lube oil additive barrels. The court concluded that the damages and injuries were caused immediately at the point of impact when the front of the Brandon truck drove under the rear bed of the Trosclair trailer.
The trier of fact specifically rejected the testimony of plaintiffs' expert, Robert Eichler, that the impact was not sufficient to release a safety elastic air bag, and the expert's conclusion that it was "not much of an impact." The court noted that this expert failed to explain how the Trosclair rear tandem assembly was broken completely away from the trailer and propelled forward 276 feet by such an allegedly minimal impact. The court concluded, "The Court must reject the opinions of plaintiffs [sic] expert. The photographs of the vehicles and other overwhelming physical evidence of this rear end collision compel the court to reject the opinions of plaintiff's [sic]expert." The expert is further contradicted by the physical fact that no oil splash was found on any part of the left front of Brandon's truck. Had the barrels caused the damage to Brandon's cabin, the cabin would have been covered with lube oil. The judge concluded that if Brandon's cabin came in contact with any barrels, it was not the driver's side of the cabin. Brandon's truck and trailer jackknifed up the highway after the impact, leading with the driver's side of the cabin for a distance of 276 feet. No evidence exists that any barrels hit the driver's side of the Brandon cabin.
We find that under the manifest error standard of review, we must not disturb the trial court's reasonable rejection of Eichler's testimony.
The trial court also rejected plaintiffs' expert's opinion that the accident was caused by Trosclair going too slowly, allowing traffic to build up behind his rig. All the evidence presented by both plaintiffs-appellants and defendants is that all the vehicles behind the Trosclair rig passed around it using the passing lane or free open lane to the left. Brandon easily could have done the same.
The judge concluded that the accident was caused by Brandon's driving at an excessive speed of over 55 miles per hour in congested highway traffic at the plant entrance; by Brandon's tailgating and following too closely; by Brandon's failure to watch out over the road; by his failure to see the vehicles in front of him passing around Trosclair in the open left passing lane; and by his failure to see and obey the flashing emergency lights.

STANDARD OF REVIEW
It is well settled that a court of appeal may not set aside a trial court's finding of fact in the absence of "manifest error" or unless it is "clearly wrong". Where there is a conflict in the testimony, *58 reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed on review, and where there are two permissible views of the evidence, the trier of fact's choice between them cannot be manifestly erroneous or clearly wrong. Appellate courts must constantly have in mind that their initial review function is not to decide factual issues de novo and when findings are based on determinations regarding the credibility of witnesses, the manifest errorclearly wrong standard demands great deference to the trier of fact's findings. Thus, where, as in the instant case, a factfinder's finding is based on its decision to credit the testimony of one or more witnesses, that finding can virtually never be manifestly erroneous or clearly wrong. Rosell v.. ESCO, 549 So.2d 840, 844-45 (La.1989). See also, Hill v. Morehouse Parish Police Jury, 95-1100 p. 4 (La.1/16/96), 666 So.2d 612, 614. Ferrell v. Fireman's Fund Ins. Co., 94-1252 (La.2/20/95), 650 So.2d 742, 745; Stobart v. State through Dept. of Transp. and Development, 617 So.2d 880 (La.1993); Arceneaux v. Domingue, 365 So.2d 1330 (La. 1978).
Our review of the record in its entirety convinces us that the trial judge's findings are reasonable in light of that record.
We are instructed that before a factfinder's verdict may be reversed, we must find from the record that a reasonable factual basis does not exist for the verdict, and that the record establishes the verdict is manifestly wrong. Lewis v. State through Dept. of Transp. and Development, 94-2370 (La.4/21/95), 654 So.2d 311, 314; Stobart v. State through Dept. of Transp. and Development, supra. Although we accord deference to the factfinder, we are cognizant of our constitutional duty to review facts[1], not merely to decide if we, as a reviewing court, would have found the facts differently, but to determine whether the trial court's verdict was manifestly erroneous, clearly wrong based on the evidence, or clearly without evidentiary support. Ambrose v. New Orleans Police Department Ambulance Service, 93-3099 (La.7/5/94), 639 So.2d 216, 221; Ferrell v. Fireman's Fund Ins. Co., 650 So.2d at 745.
When there is evidence before the trier of fact which, upon its reasonable evaluation of credibility, furnishes a reasonable factual basis for the trial court's finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Stated another way, the reviewing court must give great weight to factual conclusions of the trier of fact; where there is conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. The reason for this well-settled principle of review is based not only upon the trial court's better capacity to evaluate live witnesses (as compared with the appellate court's access only to a cold record), but also upon the proper allocation of trial and appellate functions between the respective courts. Canter v. Koehring Co., 283 So.2d 716, 724 (La.1973).

ASSIGNMENTS OF ERROR
The Brandons assigned the following three errors: First: the trial court overlooked undisputed factual evidence fundamental to the engineering and physics analyses of the cause of the second collision, resulting in misapplication of legal principles; second: the trial court made scientific conclusions unsupported by the *59 evidence; and, third: the trial court made findings of fact which were not part of the record, and which may have been based upon a personal viewing of the accident site.
Counsel argues in brief that the accident was caused by Trosclair's driving too slowly. An essential part of this argument is the allegation that a white eighteen wheeler obstructed Brandon's view of the Trosclair rig, and that the white truck pulled to pass Trosclair immediately prior to the accident. On cross-examination, Brandon admitted that he did not remember a truck in front of him prior to the accident. Credible evidence supports the conclusion that Trosclair was properly decelerating preparatory to turning into Gate 3 at the Chevron plant. We cannot say that the trial judge was manifestly wrong in concluding that Trosclair's speed did not cause the accident.
Counsel argues in brief that the Trosclair trailer's brake lights were not functioning properly; however, the only evidence of this is Eichler's opinion. Since the trial court rejected Eichler's testimony, there is no evidence to rebut Trosclair's testimony that he had tested all the lights on his rig and they were functioning properly when he set out the day of the accident. Furthermore, Bernicker testified that the bulb of the taillight was on when it was broken. In addition, Holland's testimony supports the conclusion that the Trosclair rig had been inspected just three weeks prior to the accident, and that necessary maintenance and repair had been done.
The Brandons argue that Trosclair's turn signal was not operating at the time of the accident. However, the only evidence supporting this argument is the statement by Stanley Johnson that he could not remember if Trosclair's turn signal was on when he passed Trosclair, prior to the accident. This does not rebut Trosclair's own testimony that the turn signal was engaged prior to the accident.
There is substantial reasonable evidence to support the trial court's conclusion that the barrels could not have caused the whipping action or damage to the undercarriage, axle and wheel of Brandon's rig, or the damage to the driver's side of his cab. Essentially, the damage was set in motion before the first barrel came off the Trosclair trailer. The trial judge was presented with two views of the evidence, one by Eichler and one by Bernicker. He found the latter to be more reasonable. Our review of the evidence convinces us that this was a reasonable credibility determination which we will not disturb on appeal.
The validity of the Brandons' arguments concerning the way in which the accident occurred hinges on the trial judge's inferences. If it is a permissible view of these facts that Brandon was one hundred percent at fault, then that finding cannot be disturbed on review. We are not called upon to decide whether the trial judge was wrong, but whether his conclusions were reasonable. Having reviewed the record in its entirety and examined the evidence submitted by the parties, we conclude that the trial judge's allocation of fault solely to Brandon is reasonable. See, Schwartz v. Liberty Lloyds Ins. Co., XXXX-XXXX, pp. 3-4 (La.App. 4 Cir. 3/14/01), 786 So.2d 746, 748, writ denied XXXX-XXXX (La.6/22/01), 793 So.2d 1262, citing Mistich v. Volkswagen of Germany, Inc., 95-0939 (La.1/29/96), 666 So.2d 1073, 1077.
We find nothing in the record to support Brandon's contention in his brief that the trial court judge improperly viewed the accident scene.
A driver shall not follow another vehicle more closely than is reasonable and *60 prudent, having due regard for the speed of such vehicle and the traffic upon and the condition of the highway. LSA-R.S. 32:81 A. The law has established a rebuttable presumption that a following motorist who strikes a preceding motorist from the rear has breached the standard of conduct prescribed by this statute and is therefore liable for the accident. That rule is based on the premise that a following motorist whose vehicle rear-ends a preceding motorist either has failed in his responsibility to maintain a sharp lookout or has followed at a distance from the preceding vehicle which is insufficient to allow him to stop safely under normal circumstances. Daigle v. Mumphrey, 96-1891, pp. 2-3 (La. App. 4 Cir. 3/12/97), 691 So.2d 260, 262.
In order to rebut this presumption, Brandon had the burden of proving that he had his vehicle under control; that he closely observed the preceding vehicle, and that he followed at a safe distance under the circumstances. He may also avoid liability by proving that the driver of the lead vehicle negligently created a hazard which he could not reasonably avoid. Id.
The evidence clearly does not preponderate that Brandon satisfied these conditions. He was traveling above the speed limit, admits he was looking at the scenery just before the collision, ignored the flashing lights near the plant entrance and Trosclair's brake and turn lights, and failed to keep from colliding at high speed with Trosclair's rig. We find that the trial court's conclusion that Trosclair did not create the hazard is amply supported by the evidence.
Brandon argues that violations of state or federal statutes constitute negligence per se on the part of Chevron and Trosclair. Brandon has not offered proof of the applicability of the federal regulations referred to in his brief. Pretermitting discussion of the applicability to this case of these regulations or of LSA-R.S. 32:383, both of which relate to vehicle loading, we find them to be irrelevant given the factfinder's finding, amply supported by credible evidence, that the accident and resulting damages were not in any way caused by the barrels. Louisiana's duty-risk analysis requires not only that there be a breach of a duty, but also that this breach must have been a cause in fact of the accident. Brandon has failed to satisfy the "but for" inquiry, and has not shown that but for the manner in which the barrels were loaded, the accident and resulting damage would not have occurred.
Even were we to accept Brandon's argument that the statute is applicable, we do not find it to be a basis for imposition of liability for this accident on Trosclair. The state statute does not specify the method by which cargo is to be secured; it requires only that the load should be secured in such a way that it is prevented from becoming a hazard to other users of the highway. Significantly, the statutory penalty provisions do NOT apply where the cargo becomes loose, detached, or in any manner a highway hazard "as the result of an accident or circumstances beyond the control of the operator of the vehicle." The load in question, like hundreds of other similar loads driven by Trosclair over the same route and using the same method of securing the cargo, did not become loose, detached or in any manner a highway hazard until Brandon's negligence caused the accident. Therefore, we do not find Trosclair violated the statute.

CONCLUSION AND DECREE
For the foregoing reasons, we find no manifest error in the trial court's judgment, and affirm the judgment dismissing plaintiffs-appellants' claims with prejudice *61 at their cost. Costs of this appeal are assessed against plaintiffs-appellants.
AFFIRMED.
NOTES
[1] See, LSA-Const. Art. V, section 10(B).